IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSHUA ANDERSON, as Guardian Ad Litem of minor B.J.P.; ARMANI PORTER; and TYLER PORTER, | No. 3:16-cv-05781-RBL |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

THIS MATTER came before the Court on plaintiffs' claims against the defendant, United States of America, arising from the negligence of defendant's employees, medical care providers at Madigan Army Medical Center. Having reviewed the evidence, heard the testimony, and considered the arguments of counsel, the Court now enters these Findings of Fact and Conclusions of Law.

# I. FINDINGS OF FACT

## A. BACKGROUND FACTS

1. Tyler Porter ("Tyler") was born on March 24, 1996 in Virginia.

2. According to mortality tables, the normal male life expectancy aged 23 years is 52.73 years.

3. Tyler will likely live another 52.73 years, the normal life of a man aged 23 years.

4. Armani Saunders (formerly Porter) ("Armani") was born on August 1, 1996 in Virginia.

5. According to mortality tables, the normal female life expectancy of a woman age 22 years is 58.64 years.

6. Armani will likely live another 58.64 years, the normal life of a female aged 22 years.

7. Tyler and Armani were married in Virginia on December 6, 2014.

8. B.J.P. was born on July 28, 2014 in Virginia.

9. According to mortality tables, the normal male life expectancy aged 4 years is 71.09 years.

10. B.J.P. will likely live another 71.09 years, the normal life of a male aged 4 years.

11. Tyler is B.J.P.'s father.

12. Armani is B.J.P.'s mother.

13. Tyler, Armani, and B.J.P. lived in Virginia after B.J.P.'s birth.

14. In January 2015, Tyler enlisted in the United States Army.

15. Tyler received orders to be stationed at Ft. Lewis Washington and Tyler, Armani, and B.J.P. moved to Washington on July 10, 2015.

## B. B.J.P.'S SURGERY AND THE SURGICAL FIRE

16.     Madigan Army Medical Center is a federal military treatment facility at Joint Base Lewis-McCord, Washington.

17.     Defendant United States of America operates Madigan Army Medical Center.

18.     B.J.P. underwent surgery at Madigan Army Medical Center on September 2, 2015 ("the Surgery").

19.     The purpose of the Surgery was to remove a small, benign cyst from above B.J.P.'s left eye.

20.     The care team involved in the Surgery consisted of active duty service members and Department of Army civilian employees.

21.     The care team involved in the Surgery included Phillip Cuenca, M.D., John Horton, M.D., and Benjamin Althuisius.

22.     Dr. Cuenca was the anesthesiologist for the Surgery.

23.     Dr. Horton was the pediatric surgeon who performed the Surgery.

24.     At the time of the Surgery, Benjamin Althuisius had just finished his first year of training to become a nurse anesthetist.

25.     During the Surgery, Benjamin Althuisius was under the supervision of Dr. Cuenca.

26.     Dr. Cuenca did not communicate with Dr. Horton the planned method of administering anesthesia for the Surgery.

27.     Dr. Cuenca did not inform Dr. Horton that supplemental oxygen would be supplied at a concentration in excess of 30% using an open oxygen delivery system during the Surgery.

28.     Dr. Horton did not communicate with Dr. Cuenca the planned method of excising B.J.P.'s small cyst during the Surgery.

29. Dr. Horton did not inform Dr. Cuenca that Dr. Horton would be using an electrocautery device to excise B.J.P.'s small cyst during the Surgery.

30. Dr. Cuenca did not believe that an electrocautery device would be used during the Surgery.

31. Dr. Cuenca assumed that Dr. Horton would be using a scalpel to excise B.J.P.'s small cyst during the Surgery.

32. Had Dr. Cuenca known that Dr. Horton intended to use an electrocautery device during the Surgery, Dr. Cuenca would have administered anesthesia differently.

33. Had Dr. Cuenca known that Dr. Horton intended to use an electrocautery device during the Surgery, Dr. Cuenca would have administered concentrated oxygen at a lower level.

34. Surgical fires require the existence of an oxidizer, an ignition source, and a fuel source.

35. When an environment lacks a sufficient quantity of an oxidizer, fire cannot occur.

36. When an environment lacks an ignition source, fire cannot occur.

37. When an environment lacks a fuel source, fire cannot occur.

38. Oxygen is an oxidizer.

39. Oxygen-enriched environments increases the likelihood of fire.

40. An electrocautery device is an ignition source for fire.

41. A fuel source for fire is any combustible material, including a surgical mask and human skin.

42. Surgical fires can have devastating consequences for patients.

43.  During the Surgery, B.J.P. was given inhaled anesthetic and concentrated oxygen through a mask, an open oxygen delivery system.

44.  Benjamin Althuisius was in charge of holding the mask on B.J.P.'s face and ensuring that B.J.P.'s airway remained open during the Surgery.

45.  During the Surgery, combustible materials were located at or in the vicinity of where Dr. Horton attempted to use the electrocautery device.

46.  No fire risk assessment or any other assessment of surgical fire risk was performed by the treatment providers before proceeding with the Surgery.

47.  Less than five minutes into the Surgery, Dr. Horton activated the electrocautery device.

48.  Benjamin Althuisius did not inform Dr. Horton that Dr. Horton was about to activate the electrocautery device in proximity to the open oxygen source and in an oxygen enriched environment.

49.  Benjamin Althuisius did not inform Dr. Cuenca that Dr. Horton was about to activate the electrocautery device in proximity to the open oxygen source and in an oxygen enriched environment.

50.  After Dr. Horton activated the electrocautery device, Benjamin Althuisius felt a fireball come over his right hand.

51.  When Benjamin Althuisius felt the fireball come over his right hand, Benjamin Althuisius' right hand was located on B.J.P.'s face.

52.  After feeling the fireball come over his right hand, Benjamin Althuisius threw the surgical drapes and mask into the air and away from his hand and B.J.P.'s body.

53.   When the treatment providers realized a fire had occurred, the treatment providers aborted B.J.P.'s cyst excision.

54.   The treatment providers doused saline on B.J.P.'s face.

55.   The surgical mask, which had fallen to the floor in flames, was extinguished with water.

56.   The surgical team and Dr. Horton did not allow excess oxygen to dissipate prior to Dr. Horton activating the electrocautery device during the Surgery.

57.   Dr. Cuenca was actively administering oxygen through an open delivery system in an amount much greater than 30 percent at the time Dr. Horton activated the electrocautery device.

58.   Dr. Cuenca estimates the level he was administering oxygen through an open delivery system at the time of the surgical fire to be 90%.

59.   The September 2, 2015 surgical fire occurred in an oxygen enriched environment.

60.   The September 2, 2015 surgical fire would not have ignited if the environment had not been oxygen enriched.

61.   The September 2, 2015 surgical fire was caused by the use of an electrocautery device in an oxygen enriched environment in the presence of combustible fuel sources.

62.   The September 2, 2015 surgical fire was preventable.

63.   B.J.P. was asleep under anesthesia when the September 2, 2015 surgical fire erupted.

64. Defendant admits that it failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at the time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances and that this failure was the sole proximate cause of the September 2, 2015 surgical fire and the damages proven to result from the September 2, 2015 surgical fire.

## C. DAMAGES

### B.J.P.'S DAMAGES

### 1. B.J.P.'S ACUTE RECOVERY AND ACUTE RECOVERY RELATED DAMAGES AND HARMS

65. Initial evaluation of B.J.P. immediately following the September 2, 2015 surgical fire noted obvious burns to B.J.P.'s face with the right side worse than the left. The size of the burned area was estimated up to 10% of B.J.P.'s total body surface area.

66. Harborview Medical Center Burn Center was contacted and immediate transport of B.J.P. to Harborview Medical center for further management and treatment of the injuries was recommended.

67. B.J.P. was moved to the Madigan Army Medical Center Pediatric Intensive Care Unit and awaited emergent airlift to Harborview Medical Center.

68. B.J.P. was transported by emergent airlift to Harborview Medical Center Burn Unit on September 2, 2015.

69. On September 2, 2015, B.J.P. was admitted to Harborview Medical Center Pediatric Intensive Care Unit (PICU) pending stabilization and/or appropriate management of anesthesia, pain control, respiratory management, wound care, and fluid management.

1     70.    While in the PICU, B.J.P. was critically ill.

2     71.    While in the PICU, B.J.P. appeared restless and agitated.

3     72.    While in the PICU, B.J.P. remained intubated before eventually self-extubating.

4     73.    While in the PICU, B.J.P. was diagnosed with acute respiratory failure.

5     74.    While in the PICU, B.J.P. received medications, including narcotic pain

6          medications and sedation medications.

7     75.    While in the PICU, B.J.P. received wound care.

8     76.    While in the PICU, B.J.P. experienced complications directly related to his burn

9          injuries, including bradycardia, tachycardia, hypertension, inadequate sedation,

10         rapid oxygen desaturation, acute respiratory failure, and significant edema.

11    77.    As a direct result of the injuries sustained in the surgical fire, B.J.P. was unable to

12         open his eyes for approximately three days following the fire.

13    78.    On September 5, 2015, B.J.P. was transferred from the PICU to acute care where

14         he received continued monitoring and wound care.

15    79.    On September 9, 2015, B.J.P. was placed under general anesthesia and underwent

16         a facial debridement procedure.

17    80.    While in acute care, B.J.P. experienced complications with tachycardia and fever.

18         At one point, the rapid response team was called due to B.J.P.'s decline, including

19         a temperature of 40 degrees Celsius and heart rates up to 230s.

20    81.    On September 11, 2015, B.J.P. was transferred from acute care back to the PICU

21         for closer monitoring due to ongoing tachycardia and fever and concern for

22         systemic infection.

23    82.    While in the PICU, B.J.P. was found to be positive for adenovirus.

24

83. On September 16, 2015, B.J.P.'s vital signs stabilized, and he was returned from the PICU to acute care where burn care observation and pain management continued.

84. Tyler was present during his son's hospitalization at Harborview Medical Center.

85. Armani was present during her son's hospitalization at Harborview Medical Center.

86. Tyler participated in and was taught wound care and management of B.J.P.'s wounds while B.J.P. was hospitalized at Harborview Medical Center.

87. Armani participated in and was taught wound care and management of B.J.P.'s wounds while B.J.P. was hospitalized at Harborview Medical Center.

88. On September 24, 2015 B.J.P. was discharged from Harborview Medical Center and returned to his home with his parents.

89. B.J.P. continued to receive wound care management through the Harborview Medical Center Burn Clinic.

90. On or around October 26, 2015 the wounds caused from the September 2, 2015 surgical fire had closed and acute treatment and management of the wounds had concluded. B.J.P was left with significant scarring and disfigurement to his face.

91. During the acute period of recovery, B.J.P. suffered significant damage and harm due to the nature and extent of the injuries he received from the September 2, 2015 surgical fire.

92. During the acute period of recovery, B.J.P. suffered significant disfigurement as a result of injuries he received from the September 2, 2015 surgical fire.

93. During the acute period of recovery, B.J.P. suffered significant disability as a result of injuries he received from the September 2, 2015 surgical fire.

94. During the acute period of recovery, B.J.P. suffered significant loss of enjoyment of life as a result of injuries he received from the September 2, 2015 surgical fire.

95. During the acute period of recovery, B.J.P. suffered significant physical pain and suffering as a result of injuries he received from the September 2, 2015 surgical fire.

96. During the acute period of recovery, B.J.P. suffered significant mental pain and suffering as a result of injuries he received from the September 2, 2015 surgical fire.

## 2. B.J.P.'S TREATMENT AND TREATMENT RELATED DAMAGES AND HARMS (POST-ACUTE RECOVERY)

97. B.J.P. has received post-acute recovery medical treatment and has undergone post-acute recovery medical procedures, including surgery, as a result of the injuries he suffered from the September 2, 2015 surgical fire.

98. B.J.P. will require and/or receive necessary medical care, treatment, and services in the future as a result of the injuries he suffered from the September 2, 2015 surgical fire.

99. On December 14, 2015 B.J.P. underwent surgery at Harborview Medical Center. The preoperative diagnosis was "severe hypertrophic burn scar contractures of face including nose, right upper and lower eyelids, forehead, cheek, and lips, predominantly right-sided, with severe right upper eyelid ectropion." The following procedures were performed:

1                   1) Release burn scar contractures and severe burn scar ectropion right, upper eyelid, right lower eyelid, and nose with sheet split-thickness skin graft 16 sq. cm, approximately 2% body surface area.

2) Release burn scar contracture right cheek with sheet split-thickness skin graft 4 sq. cm, approximately 1% body surface area.

3) Local tissue rearrangement Y to V flap after release burn scar contracture right cheek, nose, and upper lip, 6 sq. cm.

4) Local tissue rearrangement right lower eyelid Z-plasty/modified jumping man flap 1 sq. cm.

5) Right medial canthopexy.

6) Right lateral tarsorrhaphy.

7) A 22 modifier for sheet graft placement requiring three times more intraoperative time as well as much more intensive postoperative monitoring.

The post-operative diagnosis following the December 14, 2015 surgery was "severe hypertrophic burn scar contractures of face including nose, right upper and lower eyelids, forehead, cheek, and lips, predominantly right-sided, with severe right upper eyelid ectropion."

100. B.J.P. remained hospitalized at Harborview Medical Center until his discharge on December 18, 2015.

101. Tyler was present with B.J.P. during B.J.P.'s hospitalization from December 14, 2015 through December 18, 2015.

102. In December 2015, Tyler and Armani separated. Armani moved to Virginia near her family. Tyler continued his military service and remained stationed at Ft. Lewis, Washington, pursuant to his orders. B.J.P. returned to Virginia with Armani.

103. In January 2015, B.J.P. returned to Washington for post-surgical follow, evaluation, and further treatment.

104. On January 29, 2015 B.J.P. underwent surgery at Harborview Medical Center. The preoperative diagnosis was: "1. Right-sided facial scarring, 2. Occlusion amblyopia." The surgery performed was, "opening permanent tarsorrhaphy, right side." The surgery was performed under general anesthesia. The postoperative diagnoses were: "1. Right-sided facial scarring, 2. Occlusion amblyopia."

105. Following the January 29, 2015 surgery, B.J.P. returned to Virginia and established care with providers located in Virginia.

106. On March 29, 2017 B.J.P. underwent surgery at the Naval Medical Center Portsmouth. The surgery consisted of right medial eyelid scar revision (Z-plasty to release constriction at right medial canthal region), facial scar needling/steroid injection with $CO_2$ laser burn scar revision, lacrimal duct exploration, and left lateral periorbital dermoid cyst excision. The surgery was performed under general anesthesia.

107. On June 1, 2017 B.J.P. underwent surgery at the Naval Medical Center Portsmouth. The surgery consisted of $CO_2$ laser treatment. The surgery was performed under general anesthesia.

108. In addition to surgical procedures, B.J.P. has received treatment and medical care as a result of the injuries he suffered from the September 2, 2015 surgical fire including debridement, ophthalmology evaluations, speech evaluations, scar stretching, scar massage, cream applications, and eye drops.

109. As a result of the September 2, 2015 surgical fire, B.J.P. will likely require and/or receive the following evaluations and therapeutic modalities in the future:

- Psychological diagnostic evaluation with a child psychologist or similar specialist to assess the impact of the of the burn injury and to assess the treatment needs to help cope with problems including difficulty sleeping. The frequency of the treatment will likely be annually from B.J.P.'s current age until age 18 or beyond.

- Psychotherapy with a child psychologist or similar specialist to help B.J.P. with self-esteem, anger, and learn coping skills due to significant scarring and disfigurement. The frequency of treatment will likely be 1-2 times monthly for a minimum of 1-2 years at some time from B.J.P.'s current age to age 18 or beyond.

110. As a result of the September 2, 2015 surgical fire, B.J.P. will likely require and/or receive the following medical care in the future:

- Annual eye exams by a pediatric ophthalmologist due to the fact that severe injury to the periocular region can affect vision and function, B.J.P.'s eyelids do not blink normally, and B.J.P.'s eyelids are scarred and do not adequately

protect his eye.  The frequency of the treatment will likely be annually (or more if any ophthalmological or vision issues arise) from B.J.P.'s current age to age 18 with continued follow through adulthood if issues are detected.

- Surgery physician visits for oculofacial plastic surgery and plastic reconstructive surgery with specialists experienced in the team approach of caring for severely burned patients for evaluation and management of mechanical right upper lid ptosis, diminished right blinking, loss of upper lid crease and transition zone between pre-septal and pretarsal regions, medial canthal tethering and scar banding, loss of right eyebrow, soft tissue atrophy, and diminished volume of right periocular region.  The frequency of the treatment will likely be 2 times annually from B.J.P.'s current age until age 18.

111.  As a result of the September 2, 2015 surgical fire, B.J.P. will likely require and/or receive the following surgeries in the future:

- Right upper eyelid reconstruction: repair blepharoptosis levator resection.  The purpose of the surgery is for correction of mechanical ptosis and recreation of right upper eyelid crease and transition zone from pre-septal and pretarsal regions.

- Right upper eyelid reconstruction blepharoplasty upper eyelid / revision eyelid. The purpose of the surgery is for correction of mechanical ptosis and recreation of right upper eyelid crease and transition zone from pre-septal and pretarsal regions.

- Skin grafting: full thickness, free, with direct closure nose, eyelids, and lips. The purpose of the surgery is for correction of mechanical ptosis and recreation of right upper eyelid crease and transition zone from pre-septal and pretarsal regions.

- Skin grafting: forehead, cheeks, mouth. The purpose of the surgery to for correction of mechanical ptosis and recreation of right upper eyelid crease and transition zone from pre-septal and pretarsal regions.

- Medial canthal reconstruction with multiple Z-plasties: medial canthoplasty. The purpose of the surgery is for correction of scarring which caused tethering and banding of the normal anatomically concave region creating tension and deformity and serial release to improve thickness of scar and relieve some of the distorting visible tension lines.

- Adjacent tissue transfers and rearrangement, eyelids, nose, and lips. The purpose of the surgery is for correction of scarring which caused tethering and banding of the normal anatomically concave region creating tension and deformity and serial release to improve thickness of scar and relieve some of the distorting visible tension lines.

- Adjacent tissue transfers and rearrangement, forehead, cheeks, and mouth. The purpose of the surgery is for correction of scarring which caused tethering and banding of the normal anatomically concave region creating tension and deformity and serial release to improve thickness of scar and relieve some of the distorting visible tension lines.

- Second adjacent tissue transfers and rearrangement, eyelids, nose and lips or forehead, cheeks, and mouth. The purpose of the surgery is for correction of scarring which caused tethering and banding of the normal anatomically concave region creating tension and deformity and serial release to improve thickness of scar and relieve some of the distorting visible tension lines.

- Two or more autologous fat grafting surgeries. The purpose of the surgery is for correction of loss of volume superior periocular soft tissue resulting in loss of facial and eyelid volume with flattened appearance.

- Two or more eyebrow reconstruction surgeries: hair-bearing grafts, micro or single follicle hair transplantation: punch graft hair transplant > 15. The purpose of the surgery is to correct and improve appearance due to complete loss of right eyebrow.

- Two or more tattooing procedures: intradermal introduction of insoluble opaque pigments to correct colored defects in skin, correct skin color, 6.0 cm ≤, multiple. The purpose of the procedures is to correct and improve appearance due to complete loss of right eyebrow.

- Two to three tissue expansion surgeries: insertion tissue expander including subsequent expansion. The purpose of the surgery is to correct/improve the appearance of hypertrophic scarring, tissue discoloration and noticeable blending of graft interfaces including hyperpigmented patch over lateral aspect of right upper eyelid.

- Two to three removal surgeries for removal of tissue expander without insertion of prothesis. The purpose of the surgery is to correct/improve the appearance of hypertrophic scarring, tissue discoloration and noticeable blending of graft interfaces including hyperpigmented patch over lateral aspect of right upper eyelid.

- Three or more cutaneous therapy with lasers, bleaching or laser therapy: dermabrasion, segmental, face, intralesional injections, triamcinolone acetonide.

112. As a result of the September 2, 2015 surgical fire, B.J.P. will likely require and/or receive the following orthotics and prosthetics:

- Oral appliance post-operative.

- Compression garment (face) that is a computer-generated see-through mask that may be lined with silicone sheeting or pads to maintain and expand opening of mouth post-operatively.

113. As a result of the September 2, 2015 surgical fire, B.J.P. will likely require and/or receive the following medications and supplies:

- Cosmetics to help improve the appearance of scarred, irregular, and discolored skin. The specific quantity depends on the need for and desire for use.

- Skin bleaching products (Kojic acid or hydroquinone) for adjunctive benefit to help improve appearance of irregularly pigmented injury sites. The specific quantity depends on maturity, precautionary measures, and anatomy.

- Sunscreen for protected bleached skin. The specific quantity depends on maturity, precautionary measures, and anatomy.

114.  As a result of the September 2, 2015 surgical fire, B.J.P. will likely require and/or receive the following social/recreational needs:

- Burn Camp: Little Heroes Preschool Burn Camp, Sacramento, California. The purpose of the burn camp is to help families understand and cope with physical and emotional challenges associated with burn recovery. The frequency of the burn camp is annually until age 6.

- Central Virginia Burn Camp, Charlottesville, Virginia. The purpose of the burn camp is to enjoy summer activities with others who have gone through similar experiences and to help foster a sense of self-confidence, boost self-esteem and allow children to realize that they are not alone with their burn scars. The frequency of the burn camp is annually between ages 7-17.

115.  The present value of the evaluations and therapeutic modalities, medical care, surgeries, orthotics and prosthetics, medications and supplies, and social/recreational needs he will likely be required and/or received by B.J.P. as a result of the September 2, 2015 totals $303,162.00.

116.  Defendant admits that B.J.P. is entitled to economic damages for future medical care in the amount of $303,162.00. This amount covers the costs of Plaintiffs' life care plan as valued by their expert economist, William Brandt.

117.  B.J.P. has suffered significant damage and harm due to the nature and extent of the injuries he received from the September 2, 2015 surgical fire specifically with respect to treatment and medical procedures received post-acute recovery as a result of those injuries.

118. B.J.P. will suffer significant damage and harm due to the nature and extent of the injuries he received from the September 2, 2015 surgical fire specifically with respect to treatment and medical procedures he will receive as a result of those injuries.

119. B.J.P. has suffered significant disability from medical treatment and medical procedures received post-acute recovery as a result of the injuries he suffered from the September 2, 2015 surgical fire.

120. B.J.P. will suffer significant disability from medical treatment and medical procedures he will receive as a result of the injuries he suffered from the September 2, 2015 surgical fire.

121. B.J.P. has suffered significant disfigurement from medical treatment and medical procedures received post-acute recovery as a result of the injuries he suffered from the September 2, 2015 surgical fire.

122. B.J.P. will suffer significant disfigurement from future medical care, treatment, and services needed as a result of the injuries he suffered from the September 2, 2015 surgical fire.

123. B.J.P. has suffered significant loss of enjoyment of life from medical treatment and medical procedures received post-acute recovery as a result of the injuries he suffered from the September 2, 2015 surgical fire.

124. B.J.P. will suffer significant loss of enjoyment of life from future medical care, treatment, and services needed as a result of the injuries he suffered from the September 2, 2015 surgical fire.

125. B.J.P. has suffered significant physical pain and suffering from medical treatment and medical procedures received post-acute recovery as a result of the injuries he suffered from the September 2, 2015 surgical fire.

126. B.J.P. will suffer significant physical pain and suffering from future medical care, treatment, and services needed as a result of the injuries he suffered from the September 2, 2015 surgical fire.

127. B.J.P. has suffered significant mental pain and suffering from medical treatment and medical procedures received post-acute recovery as a result of the injuries he suffered from the September 2, 2015 surgical fire.

128. B.J.P. will suffer significant mental pain and suffering from future medical care, treatment, and services needed as a result of the injuries he suffered from the September 2, 2015 surgical fire.

## 3. B.J.P.'S DISFIGUREMENTS, DEFORMITIES, AND PHYSIOLOGICAL DAMAGES AND HARMS

129. As a result of the September 2, 2015 surgical fire, B.J.P. has significant and permanent physical disfigurements, deformities, and physiological changes.

130. B.J.P. has suffered significant damage and harm due to the nature and extent of the permanent physical disfigurements, deformities, and physiological changes as a result of the September 2, 2015 surgical fire.

131. B.J.P. will suffer significant damage and harm due to the nature and extent of the permanent physical disfigurements, deformities, and physiological changes as a result of the September 2, 2015 surgical fire.

132.    B.J.P.'s significant and permanent physical disfigurements, deformities, and physiological changes as a result of the September 2, 2015 surgical fire include:

- Extensive hypertrophic scarring and discoloration of the right forehead.

- Extensive hypertrophic scarring and discoloration of the right upper and lower eyelids.

- Extensive hypertrophic scarring and discoloration of the right glabellar region.

- Extensive hypertrophic scarring and discoloration of the right medial and lateral canthi.

- Extensive hypertrophic scarring and discoloration of the right cheek.

- Extensive hypertrophic scarring and discoloration of the upper lip.

- Extensive hypertrophic scarring and discoloration of the chin.

- Extensive hypertrophic scarring and discoloration of the jaw line.

- Hypertrophic scarring and discoloration of the left lower lid and malar region.

- Large plaque like distribution of raised and discolored scarring on left check.

- Thick, dense, and irregularly pigmented scars predominantly involving the right hemiforehead.

- Mechanical right upper lid ptosis.

- Loss of right upper lid crease and transition zone between preseptal and pretarsal regions.

- Medial canthal tethering and scar banding.

- Thick scar band contractures/webbing particularly to the right medial canthal region, nose, lips and perioral regions with notable symmetric deviation.

- Complete loss of right eyebrow.

- Destruction of portions of nose.

- Soft tissue atrophy and diminished volume of right periocular region (including brow, forehead, eyelids, and upper cheek regions)

- Deviation of the ipsilateral nars and columella, scarred irregularity of upper lip centrally and laterally, was well as band-like constriction, narrowing the oral aperture and obscuring on the right commissure.

- Tearing and crusting of right eye.

- Diminished right blinking.

- Distortion of mouth and restriction of use and expression.

- Loss of sweat glands in burned areas.

- Loss of facial expression and distortion of facial expression.

- Sensitivity to sunlight.

- Loss of scalp skin.

## 4. B.J.P. LOSS OF A NORMAL LIFE (SUSTAINED AND PERCEPTIVE DAMAGES AND HARMS)

133.    B.J.P. has and will suffer sustained and perceptive damages and harms as a result of the injuries he received from the September 2, 2015 surgical fire.

134.    In addition to those damages during B.J.P.'s acute period of recovery and those damages associated with treatment and medical procedures, B.J.P. has suffered significant damage and harm due to the nature and extent of the injuries he received from the September 2, 2015 surgical fire.

1

135. In addition to those damages associated with future treatment and medical procedures, B.J.P. will suffer significant damage and harm due to the nature and extent of the injuries he received from the September 2, 2015 surgical fire.

136. In addition to those damages during B.J.P.'s acute period of recovery and those damages associated with treatment and medical procedures, B.P.J. has suffered significant disability as a result of injuries he received from the September 2, 2015 surgical fire.

137. In addition to those damages associated with future treatment and medical procedures, B.J.P. will suffer significant disability as a result of injuries he received from the September 2, 2015 surgical fire.

138. In addition to those damages during B.J.P.'s acute period of recovery and those damages associated with treatment and medical procedures, B.J.P. has suffered significant loss of enjoyment of life as a result of injuries he received from the September 2, 2015 surgical fire.

139. In addition to those damages associated with future treatment and medical procedures, B.J.P. will suffer significant loss of enjoyment of life as a result of injuries he received from the September 2, 2015 surgical fire.

140. In addition to those damages during B.J.P.'s acute period of recovery and those damages associated with treatment and medical procedures, B.J.P. has suffered significant physical pain and suffering as a result of injuries he received from the September 2, 2015 surgical fire.

141. In addition to those damages associated with future treatment and medical procedures, B.J.P. will suffer significant physical pain and suffering as a result of injuries he received from the September 2, 2015 surgical fire.

142. In addition to those damages during B.J.P.'s acute period of recovery and those damages associated with treatment and medical procedures, B.J.P. has suffered significant mental pain and suffering as a result of injuries he received from the September 2, 2015 surgical fire.

143. In addition to those damages associated with future treatment and medical procedures, B.J.P. will suffer significant mental pain and suffering as a result of injuries he received from the September 2, 2015 surgical fire.

## B.J.P.'S MOTHER AND FATHER'S DAMAGES AND HARM

### 1. ARMANI'S DAMAGES AND HARMS

144. Armani has regularly contributed to the support of B.J.P. Armani has had significant involvement in B.J.P.'s life, including but not limited to, emotional, psychological, and financial support.

145. As a result of the September 2, 2015 surgical fire, Armani has suffered significant loss of love and companionship with B.J.P.

146. As a result of the September 2, 2015 surgical fire, Armani will suffer significant loss of love and companionship with B.J.P.

147. As a result of the September 2, 2015 surgical fire, Armani has experienced injury to the parent-child relationship.

148. As a result of the September 2, 2015 surgical fire, Armani will experience injury to the parent-child relationship.

149. As a result of the September 2, 2015 surgical fire, Armani has experienced destruction of the parent-child relationship.

150. As a result of the September 2, 2015 surgical fire, Armani will experience destruction of the parent-child relationship.

151. As a result of the September 2, 2015 surgical fire, Armani has suffered significant mental anguish.

152. As a result of the September 2, 2015 surgical fire, Armani will suffer significant mental anguish.

153. As a result of the September 2, 2015 surgical fire, Armani has suffered significant parental grief.

154. As a result of the September 2, 2015 surgical fire, Armani will suffer significant parental grief.

155. As a result of the September 2, 2015 surgical fire, Armani has experienced significant suffering.

156. As a result of the September 2, 2015 surgical fire, Armani will experience significant suffering.

157. As a result of the September 2, 2015 surgical fire, Armani has suffered significant emotional stress.

158. As a result of the September 2, 2015 surgical fire, Armani will suffer significant emotional stress.

## 2. TYLER'S DAMAGES AND HARMS

159. Tyler has regularly contributed to the support of B.J.P.

160. Tyler has had significant involvement in B.J.P.'s life, including but not limited to, emotional, psychological, and financial support.

161. As a result of the September 2, 2015 surgical fire, Tyler has suffered significant loss of love and companionship with B.J.P.

162. As a result of the September 2, 2015 surgical fire, Tyler will suffer significant loss of love and companionship with B.J.P.

163. As a result of the September 2, 2015 surgical fire, Tyler has experienced injury to the parent-child relationship.

164. As a result of the September 2, 2015 surgical fire, Tyler will experience injury to the parent-child relationship.

165. As a result of the September 2, 2015 surgical fire, Tyler has experienced destruction of the parent-child relationship.

166. As a result of the September 2, 2015 surgical fire, Tyler will experience destruction of the parent-child relationship.

167. As a result of the September 2, 2015 surgical fire, Tyler has suffered significant mental anguish.

168. As a result of the September 2, 2015 surgical fire, Tyler will suffer significant mental anguish.

169. As a result of the September 2, 2015 surgical fire, Tyler has suffered significant parental grief.

170. As a result of the September 2, 2015 surgical fire, Tyler will suffer significant parental grief.

171.     As a result of the September 2, 2015 surgical fire, Tyler has experienced significant suffering.

172.     As a result of the September 2, 2015 surgical fire, Tyler will experience significant suffering.

173.     As a result of the September 2, 2015 surgical fire, Tyler has suffered significant emotional stress.

174.     As a result of the September 2, 2015 surgical fire, Tyler will suffer significant emotional stress.

## II.  **CONCLUSIONS OF LAW**

## A.  **LIABILITY**

1.     Plaintiffs' claims are brought against the United States of America under the Federal Tort Claims Act ("FTCA") (28 U.S.C. § 267, *et seq.*) and 28 U.S.C. § 1346(b)(1).  The Court has jurisdiction over the matter.

2.     Plaintiffs allege that the negligence of health care providers acting within the course of their employment with the United States of America caused damage to plaintiffs.

3.     Under the Federal Tort Claims Act, liability and damages are determined according to the law of the place where the act or omission occurred.

4.     The conduct at issues concerns the acts or omissions of health care providers acting within the course of their employment with the United States of America with respect to B.J.P.'s September 2, 2015 surgery at Madigan Army Medical Center, a federal military treatment facility at Joint Base, Lewis-McCord, Washington.  The law to be applied in this case is the substantive law of Washington.

5.     RCW 7.70.030 provides, in part:

No award shall be made in any action or arbitration for damages for injury as a result of health care which is provided after June 25, 1976, unless the plaintiff establishes one or more of the following propositions:

(1) That injury resulted from the failure of a health care provider to follow the accepted standard of care: . . .

6.     RCW 7.70.040 provides:

The following shall be the necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:

(1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at the time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;

(2) Such failure was a proximate cause of the injury complained of.

7.     The United States of America admits and the Court concludes that the United States of America, through the health care providers acting within the course of their employment with the United States of America, failed to exercise the degree of care, skill, and learning expected of a reasonably prudent health care provider at the time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances and that this failure was the sole proximate cause of the September 2, 2015 surgical fire and the damages proven as a result of the September 2, 2015 surgical fire.

## B. DAMAGES

### B.J.P.'S DAMAGES

8.  Under Washington law, the Court must determine the amount of money that will reasonably and fairly compensate B.J.P. for such damage proximately caused by the negligence of the United States of America.

### 1. B.J.P.'S ACUTE RECOVERY AND ACUTE RECOVERY RELATED DAMAGES AND HARMS

9.  The Court concludes that the United States of America's negligence proximately caused B.J.P. general (noneconomic) damages during B.J.P.'s acute recovery from the injuries sustained in the September 2, 2015 surgical fire. The Court considered the following noneconomic damages elements: the nature and extent of the injuries, the disability, the disfigurement, the loss and enjoyment of life experienced and with reasonable probability to be experienced in the future, physical pain and suffering experienced and with reasonable probability to be experienced in the future, and mental pain and suffering and with reasonable probability to be experienced in the future. The Court concludes and awards B.J.P. general (noneconomic) damages for the period of B.J.P.'s acute recovery from injuries sustained in the September 2, surgical fire in the amount of:

$2,000,000.00 _____ .

\\\\

\\\

\\

\

## 2. B.J.P.'S TREATMENT AND TREATMENT RELATED DAMAGES AND HARMS (POST ACUTE RECOVERY)

10. The Court concludes that as a proximate cause of the United States of America's negligence, B.J.P. has received reasonable post-acute recovery medical treatment and has undergone reasonable post-acute recovery medical procedures including surgery as a result of the injuries he suffered from the September 2, 2015 surgical fire.

11. The Court concludes that as a proximate cause of the United States of America's negligence, B.J.P. will require and/or receive necessary medical care, treatment, and services in the future as a result of the injuries he suffered from the September 2, 2015 surgical fire.

12. The Court concludes that the United States of America's negligence proximately caused B.J.P. general (noneconomic) damages resulting from B.J.P.'s post-acute recovery medical treatment to date and, with reasonable certainty, medical treatment that will be received in the future. The Court concludes that the United States of America's negligence proximately caused B.J.P. general (noneconomic) damages resulting from B.J.P.'s post-acute recovery medical procedures including surgery received to date and, with reasonable certainty, medical procedures including surgery that will be received in the future. The Court considered the following noneconomic damages elements: the nature and extent of the injuries, the disability, the disfigurement, the loss and enjoyment of life experienced and with reasonable probability to be experienced in the future, physical pain and suffering experienced and with reasonable probability to be experienced in the future, and mental pain and suffering and with reasonable probability to be experienced in the

future. The Court concludes and awards B.J.P. general (noneconomic) damages for B.J.P.'s post-acute recovery medical treatment and post-acute recovery medical procedures including surgery in the amount of:

$3,000,000.00                                                          .

13.    The United States of America admits that B.J.P. is entitled to economic damages for future medical care in the amount of $303,162.00 and that this amount covers the costs of B.J.P.'s life care plan as valued by plaintiffs' expert economist, William Brandt. The Court concludes and awards B.J.P. economic damages for future medical care in the amount of: $303,162.00.

**3. B.J.P.'S DISFIGUREMENTS, DEFORMITIES, AND PHYSIOLOGICAL DAMAGES AND HARMS**

14.    The Court concludes that as a proximate cause of the United States of America's negligence, B.J.P. has suffered permanent physical disfigurements, deformities, and physiological changes.

15.    The Court concludes that as a proximate cause of the United States of America's negligence, B.J.P. has and will continue to suffer general (noneconomic) damages for B.J.P.'s physical disfigurements, deformities, and physiological changes that have existed following B.J.P.'s post-acute recovery and are in addition to any damages specifically resulting from B.J.P.'s recovery from any treatment or medical procedure. The Court considered the following noneconomic damages elements: the disfigurements and the nature and extent of the disfigurements. The

Court concludes and awards B.J.P. general (noneconomic) damages for B.J.P.'s physical disfigurements, deformities, and physiological changes that have existed following B.J.P.'s post-acute recovery and are in addition to any damages specifically resulting from B.J.P.'s recovery from any treatment or medical procedure in the amount of:

$2,000,000.00_____.

## 4. B.J.P. LOSS OF A NORMAL LIFE (SUSTAINED AND PERCEPTIVE DAMAGES AND HARMS)

16. The Court concludes that as a proximate cause of the United States of America's negligence, B.J.P. has suffered and will suffer sustained and perceptive damages and harms. These general (noneconomic) damages are in addition to any damage suffered during B.J.P.'s acute recovery; any damages from B.J.P.'s treatment and medical procedures; and any physical disfigurement, deformity, or physiological changes. The Court considered the following noneconomic damages elements: the nature and extent of the injuries, the disability, the loss of enjoyment of life, the physical pain and suffering, and the mental pain and suffering. The Court concludes and awards B.J.P. general (noneconomic) damages for B.J.P.'s sustained and perceptive damages in addition to any damage suffered during B.J.P.'s acute recovery; any damages from B.J.P.'s treatment and medical procedures; and any physical disfigurement, deformity, or physiological changes in the amount of:

$2,000,000.00_____.

## B.J.P.'S MOTHER AND FATHER'S DAMAGES

17.     RCW 4.24.010 provides, in part:

>   A mother or father, or both, who has regularly contributed to the support of his or her minor child, and the mother or father, or both, of a child on whom either, or both, are dependent upon for support may maintain or join as a party an action as plaintiff for the injury or death of the child.

>                    * * *

>   In such an action, in addition to damages for medical, hospital, medication expenses, and loss of services and support, damages may be recovered for the loss of love and companionship of the child and for injury to the destruction of the parent-child relationship in such amounts as, under all the circumstances of the case, may be just.

Washington law recognizes that in an action by a mother or father brought under RCW 4.24.010, the mother or father's damages also include parental grief, mental anguish, and suffering.

## 1.   B.J.P.'S MOTHER'S DAMAGE (ARMANI SAUNDERS)

18.     The Court concludes that Armani Saunders (formerly Porter), has contributed to the support of B.J.P. and may recover damages pursuant to RCW 4.24.010.

19.     The Court concludes that the United States of America's negligence proximately caused damage to Armani Saunders recoverable under RCW 4.24.010 and concludes and awards Armani Saunders damages in the amount of:

$1,500,000.00                                                   .

## 2. B.J.P.'S FATHER'S DAMAGE (TYLER PORTER)

20.   The Court concludes that Tyler Porter, father of B.J.P., has contributed to the support of B.J.P. and may recover damages pursuant to RCW 4.24.010.

21.   The Court concludes that the United States of America's negligence proximately caused damage to Tyler Porter recoverable under RCW 4.24.010 and concludes and awards Tyler Porter damages in the amount of:

$1,500,000.00                                                      .

DATED this 18th day of June, 2019.

Ronald B. Leighton
United States District Judge